Minute Order Form (06/97)

# United States District Court, Northern District of Illinois



| Name of Assigned Judge or Magistrate Judge | James B. Moran | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 01 C 268 | **DATE** | 4/24/2002 |
| **CASE TITLE** | G.M. Hartson etc. et al. Vs. The City of Chicago et al. | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

Memorandum Opinion and Order

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]
(2) ☐ Brief in support of motion due _____.
(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.
(4) ☐ Ruling/Hearing on _____ set for _____ at _____.
(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.
(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.
(7) ☐ Trial[set for/re-set for] on _____ at _____.
(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.
(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
  ☐ FRCP4(m)   ☐ General Rule 21   ☐ FRCP41(a)(1)   ☐ FRCP41(a)(2).
(10) ■ [Other docket entry] Enter Memorandum Opinion and Order. In the meantime, however, we grant the motion to strike and bar to the extent indicated. Plaintiffs' Rule 16 motion is denied. Status hearing set for May 7, 2002 at 9:15am.

(11) ■ [For further detail see order attached to the original minute order.]

| | No notices required, advised in open court. | | | Document Number |
|---|---|---|---|---|
| | No notices required. | | number of notices | |
| | Notices mailed by judge's staff. | | APR 26 2002 date docketed | |
| | Notified counsel by telephone. | | | |
| ✓ | Docketing to mail notices. | | | 68 |
| | Mail AO 450 form. | U.S. DISTRICT COURT | docketing deputy initials | |
| | Copy to judge/magistrate judge. | | | |
| WAH | courtroom deputy's initials | 02 APR 25 AM 5:53 | date mailed notice | |
| | | Date/time received in central Clerk's Office | mailing deputy initials | |

DOCKETED
APR 26 2002

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| G.M. HARSTON CONSTRUCTION CO., INC., and GLENN M. HARSTON, | ) ) ) |
| Plaintiffs, | ) ) ) |
| vs. | ) No. 01 C 268 ) |
| THE CITY OF CHICAGO, an Illinois municipal corporation, DAVID E. MALONE, and HARSTON/ SCHWENDENER, a Joint Venture, | ) ) ) ) ) ) |
| Defendants. | ) |

## MEMORANDUM OPINION AND ORDER

G. M. Harston Construction Co. is a minority-owned and -operated construction company and Glenn H. Harston (hereinafter jointly "Harston Construction") is its owner and president. That company owns 51% of Harston/Schwendener, A Joint Venture (HSJV). HSJV was a general contractor for the Lakefront Millennium Project at the north end of Grant Park, and Harston Construction was a subcontractor. The contract between the City of Chicago (City) and HSJV was terminated effective June 11, 2000, for the convenience of the City, and Harston Construction and HSJV are still seeking to be paid.

The termination was almost two years ago and this suit was filed well over a year ago. Since then the efforts of the parties have been largely devoted to establishing legal positions. We are not at all confident that comparable effort has gone into establishing the substance or even the dimensions of the dispute. Harston Construction and HSJV (for convenience we will refer to them as plaintiffs, although HSJV is actually a defendant and cross-claimant) insist that they are entitled to cost-plus recovery, their expenses and a reasonable profit, up until the

68

termination date. The City insists it is entitled to offsets, whatever those might be. Seemingly, plaintiffs will not discuss offsets because the City is not entitled to any. Seemingly, the City will not quantify offsets because plaintiffs are unwilling to discuss them. Consequently, neither we nor at least the plaintiffs are aware of the magnitude of the dispute. All we do know is that HSJV was terminated for the convenience of the City pursuant to a written contract, not for any material breach, and that the City did not then specify any breaches or afford HSJV any opportunity to cure.

Plaintiffs now seek to establish their position that they are entitled to cost-plus recovery, using a Fed.R.Civ.P. Rule 16 motion as the vehicle, supposedly as a simplification of the issues. While we think their motion is in reality a summary judgment motion, without full discovery and without a record in the form required by our local rules relating to Rule 56, we do believe that the issues have been fairly joined and that we can appropriately rule.

Plaintiffs' motion depends entirely, or almost entirely, upon a transcript of a meeting on June 1, 2000, attended by Judith Rice, Commissioner of the Chicago Department of Transportation (CDOT); Richard Kinczyk, First Deputy Commissioner; S J. Kaderbek, Deputy Commissioner; Hugh P. Murphy, Chief Management Officer of the Office of the Mayor (who left early); Paul Spieles, Deputy Purchasing Agent, Chicago Department of Purchases, Contracts and Supplies; and HSJV representatives Glenn M. Harston, Michael Schwendener, and Douglas Money. Schwendener made an audio tape recording of that meeting, unbeknownst to any of the other participants at the meeting. Plaintiffs claim that the transcript establishes that the City is obligated to pay cost-plus without offsets. The City, while disputing that conclusion, moves to strike and bar the use of the tape as evidence, as well

as any material derived from the tape. It contends that the taping violated the Illinois Eavesdropping Act, 720 ILCS 5/14-1 to 14-9 (2000). Plaintiffs argue that the taping was of a meeting required to be open to the public under the Open Meetings Act, 5 ILCS 120 *et seq*, and therefore was permissible. They also contend that the tape can be used for some purposes even if the taping violated the Eavesdropping Act. The initial issue is, then, whether or not the meeting was required to be open pursuant to the statute. We conclude it was not.

The Open Meetings Act sweeps broadly:

120/1. Policy
§ 1. Policy. It is the public policy of the State that public bodies exist to aid in the conduct of the people's business and that the people have a right to be informed as to the conduct of their business. In order that the people shall be informed, the General Assembly finds and declares that it is the intent of this Act to ensure that the actions of public bodies be taken openly and that their deliberations be conducted openly.
    The General Assembly further declares it to be the public policy of this State that the citizens shall be given advance notice of and the right to attend all meetings at which any business of a public body is discussed or acted upon in any way. Exceptions to the public's right to attend exist only in those limited circumstances where the General Assembly has specifically determined that the public interest would be clearly endangered or the personal privacy or guaranteed rights of individuals would be clearly in danger of unwarranted invasion.
    To implement this policy, the General Assembly declares:
    (1) It is the intent of this Act to protect the citizen's right to know; and
    (2) The provisions for exceptions to the open meeting requirements shall be strictly construed against closed meetings.

120/1.02. Definitions
§ 1.02. For the purposes of this Act:
"Meeting" means any gathering of a majority of a quorum of the members of a public body held for the purpose of discussing public business.
    "Public body" includes all legislative, executive, administrative or advisory bodies of the State, counties, townships, cities, villages, incorporated towns, school districts and all other municipal corporations, boards, bureaus, committees or commissions of this State, and any subsidiary bodies of any of the forgoing including but not limited to committees and subcommittees which are supported in whole or in part by tax revenue, or which expend tax revenue,

except the General Assembly and committees or commissions thereof. "Public body" includes tourism boards and convention or civic center boards located in counties that are contiguous to the Mississippi River with populations of more than 250,000 but less than 300,000. "Public Body" includes the Health Facilities Planning Board. "Public Body" does not include a child death review team established under the Child Death Review Team Act or an ethics commission, ethics officer, or ultimate jurisdiction authority acting under the State Gift Ban Act as provided by Section 80 of that Act.

Plaintiffs have an additional argument based upon the statutory language of § 1.02 at the time of the meeting. The provision defining "Meetings" then used the word "commissioners" rather than "members." Plaintiff contends that Rice was the CDOT commissioner; that CDOT is a public body (at least for the purposes of the Freedom of Information Act), Duncan Publishing, Inc. v. City of Chicago, 304 Ill.App.3d 778, 709 N.E.2d 1281 (1st Dist. 1999); that she was at a meeting for the purpose of discussing public business; and therefore the meeting was required to be open. But the substitution of "commissioners" for "members," for sixteen months, was clearly a scriveners error, as is recognized in the historical and statutory notes to the compiled statutes. The word was substituted without the change being indicated in the enrolled bill by either strike-through or underscore (and without any other indication of any legislative intention to make such a far-reaching change). The word had been "members" since 1957, which brought within its ambit meetings of the myriad public bodies referred to in the definition of "Public Body," a very few of which had members designated as "commissioners." Accepted literally, the change would have emasculated the statute for sixteen months. That obviously was not the legislative intention.

But even with acceptance of the use of "members," the scope of the statute is by no means self-defining if one focuses solely upon 120/1 and 120/1.02. We think what the Illinois legislature had in mind can best be discerned by a review of the remaining provisions of the

statute. After listing in 120/2 the many instances in which meetings may be closed, the statute specifies in 120/2.01 that all meetings required to be public shall be held at specified times and places convenient to the public. Section 120/2.02 provides that everybody subject to the Act shall give notice at the beginning of each calendar or fiscal year of the schedule of regular meetings, and ordinarily notice of any rescheduling or special meetings shall be given at least 24 hours in advance. Copies of such notices shall be provided to media that has filed an annual request. Pursuant to 120/2.03, a change in regular meeting dates requires, ordinarily, 10 days advance notice to the local newspaper. Section 120/2.05 provides that any person may tape or film the meeting. All public bodies shall keep written minutes of open meetings, which shall be available to the public within seven days.

The thrust of the Open Meetings Act is to require that the deliberations of established deliberative bodies be public. Its requirements cannot be circumvented by a rump group of such a deliberative body conferring in private. People ex rel. Defanis v. Barr, 83 Ill.2d 191, 414 N.E.2d 731 (1980). The statute extends to advisory bodies of such public bodies, pursuant to 120/1.02, The Board of Regents of the Regency University System v. Reynard. 292 Ill.App.3d 968, 686 N.E.2d 1222 (4th Dist. 1997), unless they are primarily an *ad hoc*, informal advisory group, Pope v. Parkinson, 48 Ill.App.3d 797, 363 N.E.2d 438 (4th Dist. 1977).

We do not believe, however, that the statute extends to *ad hoc* gatherings of staff, whether or not meeting with contractors or developers. They are neither a public body nor a constituent element of a public body. *See* People ex rel. Cooper v. Carlson, 28 Ill.App.3d 569, 328 N.E.2d 675 (2d Dist. 1975); Lurie v. Village of Skokie, 64 Ill.App.3d 217, 380 N.E.1d 1120 (1st Dist. 1978). Such a group is not an established deliberative body nor some of the members

of such a body. By its nature it cannot give notice of scheduled meetings a year in advance, nor keep media advised well in advance of what staff may be getting together, and when. If plaintiffs were correct that a commissioner discussing any public business with anyone, including staff, came within the ambit of the Open Meetings Act, then the commissioner would violate the statute when she telephoned a subordinate for an update on an ongoing project unless she provided notice well in advance of the call, permitted any member of the public to tape and film the call, and kept minutes of what was said by whom, which would then become available to the public within seven days. The absurdity of that interpretation of the Open Meetings Act is manifest.

If the tape is not permissible by virtue of the Open Meetings Act it cannot be used as direct evidence because it contravenes the Eavesdropping Act. The plaintiffs do not dispute that. But can it be used for more limited purposes, and to what extent does it taint other evidence? We see no reason to reach those questions now because of our view respecting the larger issue: is the City foreclosed from contending that it can charge offsets? We do not believe that it is, although we do not now determine that it can charge offsets. In the meantime, however, we grant the motion to strike and bar to the extent indicated.

The City and HSJV had a written contract. That contract provided for termination for the convenience of the City. Section 111.8 of the contract provides as follows:

111.8 Termination for Convenience

The City, through the Purchasing Agent, reserves the right, for its convenience, to terminate the Work by written notice stating the effective date of such termination. Immediately upon receipt of such notice, the Contractor shall then provide similar written notice to the affected Subcontractor(s); whereupon such Contractor and Subcontractor(s) shall, except for services necessary for the orderly termination of the Work: (i) stop all Work and place no further order

or contracts for materials, services, equipment or supplies; (ii) assign to the City, in the manner and to the extent directed, all of the rights of the Contractor and Subcontractor(s) under Work orders, purchase orders and subcontracts or sub-subcontracts relating to the portion of the Work that has been completed; (iii) terminate Work orders, purchase orders and subcontracts outstanding to the extent that they relate to the Work and are not assigned to the City; (iv) take any action necessary to protect property in the Contractor's possession in which the City has or may acquire an interest; and (v) take any other action toward termination of the Work which the City may direct.

In the event that all or a portion of the Work of the Contractor is terminated for convenience, the Contractor shall be entitled to payment of those costs relating to the completed portion of the Work as hereinafter defined. The City shall thereafter pay to the Contractor, subject to the limitations herein set forth, the sum of the following costs which represent the respective interest of the Contractor to the completed portion of the Work:

A. Portion of the Contract price relating to the Work completed by the Contractor immediately prior to Notice of Termination less the payments for progress or changes previously made.

B. Expenses incurred for which the Contractor is liable as the result of termination by Contractor of respective purchase orders or subcontracts related to the notice of termination.

C. No payment shall be made for Work not actually performed. Deductions will be made by the City for any amounts previously paid to Contractor and for any amounts which may be due the City, or which City may offset or withhold by the terms hereof.

D. The total amount of all payments to the Contractor shall not exceed in any event, the proportion of the total Contract price that the Work actually performed (including materials delivered to the Project site minus credits for returned goods or canceled orders) at the date of termination bears to the entire Work to be performed hereunder. Any payment to Contractor under this subparagraph shall be made in accordance with Section 103, "PROVISIONS REGARDING PAYMENT".

After receipt of a notice of termination for convenience, Contractor shall submit to the Commissioner its written termination claim in the form and with the supporting documentation the Commissioner may require such as invoices, certified payrolls, receipts and other proof of expenditures. Such claims shall be submitted promptly, but in no event more than ninety (90) days after the effective date of termination. Failure to submit a claim within ninety days after the effective date of termination shall constitute a waiver of the claim.

The termination letter is dated June 1, 2000, and was presented at the meeting, although it did not become effective until June 11, 2000. It invoked section 111.8 and included the following paragraph:

> The City expressly reserves, and nothing contained in this notice of termination shall be construed as a waiver on the part of the City of, all rights granted to the City under Section 111.2 or any other provision of the subject contracts, in equity or at law.

Section 111.2 lists nine failures to perform as events of default. We refer to the reference to section 111.2 not because it necessarily increases the City's options under section 111.8 – the termination was for convenience, not for cause – but because it is inconsistent with a claim that any right to offsets was waived at the June 1, 2000, meeting. We have read the transcript, most of which dealt with the possible continuation of HSJV as a general contractor. Some comments can certainly be construed as at least an expectation that the City would not assert any offsets. Other comments, such as references to paying costs reasonably allocated to the job, are more ambiguous. The termination letter is, however, unambiguous. It is inconsistent with the clear waiver of a known right. Nor is it at all clear that the City representatives could orally waive contract rights when that waiver constitutes a modification of the contract, although it is clear that the CDOT Commissioner and Purchasing Agent, with slightly different roles, could decide what was and what was not appropriate performance. In any event, even were we to consider the transcript, we do not believe the record unambiguously establishes a clear waiver of rights to offsets.

Plaintiffs also contend that the reference to offsets in section 111.8 can reasonably be interpreted as referring only to offsets for work not performed. But by framing the issue that way, as they must, they preclude any summary disposition based upon that interpretation.

Finally, plaintiffs contend that termination for convenience necessarily means that

offsets for substandard or delayed performance cannot be considered. They rely primarily upon federal administrative and Court of Claims cases. Even there, however, that standard is qualified. For example, in <u>Best Foam Fabricators, Inc. v. United States</u>, 38 Fed.Cl. 627, 640 (Fed.Cl. 1997), the court embraced the concept in general but then qualified it by excepting gross deficiencies and gross disregard of contractual obligations and then went on to conclude that there really are no deficiencies at all. More to the point, though, section 111.8 does refer to offsets and, at a minimum, that reference can plausibly be interpreted as permitting offsets for deficient performance or delay caused by the contractor. Plaintiffs' Rule 16 motion is denied.

Nevertheless, plaintiffs have a legitimate complaint. The termination was for the City's convenience, and even the City concedes that the normal model for determining the amount owed is cost-plus. It is not enough for the City to say that it is in a litigation posture and that somehow changes the rules. It is long past the time that the City should have advised plaintiffs of what offsets its claims and its reasons for so claiming. The parties can then discuss the legitimacy of those offsets, which should not rise to the level of material defaults. The City, on June 1, 2000, and at other times, recognized its obligations to its contractors and committed itself to treat them fairly – which is, after all, its contractual duty. It has yet to carry through on that commitment.

*James B. Moran*
JAMES B. MORAN
Senior Judge, U. S. District Court

April 24, 2002.