

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| G.M. HARSTON CONSTRUCTION CO., INC., and GLENN M. HARSTON, <br><br> Plaintiffs, <br><br> vs. <br><br> THE CITY OF CHICAGO, an ILLINOIS municipal corporation, DAVID E. MALONE, and HARSTON/SCHWENDENER, a Joint Venture, <br><br> Defendants. | No. 01 C 268 |

## MEMORANDUM OPINION AND ORDER

In the usual construction project, the owner makes progress payments, with some withheld. If all goes well, the balance is paid after completion. If the contractor is able to stay within his budget, he makes his expected profit. If all does not go entirely well, the contractor may be compensated for additional work specified by change orders, or the last payment may be reduced because of deficiencies attributable to the contractor.

Millenium Park was not the usual construction contract. Newspaper accounts indicate that the project was more than $300,000,000 over budget and four years behind schedule. Much of the overrun was apparently attributable to changes in the scope of the project over time. Some were apparently due to an initial effort to complete the project on a fast track, with the plans being developed as the project advanced, necessitating numerous revisions which, in turn, resulted in changes in work already completed and various delays. And some overruns may have been due to deficiencies by various contractors and others.

This dispute has now gone on almost as long as the construction of Millenium Park, with no end in sight.

The parties[1] vigorously dispute how any additional compensation should be determined, and, in doing so, blend together concepts about what is compensable and what methodology is appropriate. We begin, then, with what may be compensable, and for that we must look to the contracts governing their relationship.

The City recognizes only an obligation to pay for the portion of the original contracts satisfactorily completed, less any offsets. It contends that it is not responsible for costs occasioned by delay, or by changes not memorialized by a written change order. It is mistaken.

The City relies on sections 111.8, 103 and 104.4 of both contracts, as well as various General Conditions. Section 111.8 sets forth the mutual obligations resulting from a termination for convenience, which this was. That means (and the City has so stated on occasion) that the City does not contend that HSJV was in material default; while there may be some offsets for deficiencies, HSJV is entitled to payment for that portion of the contract price that relates to work completed immediately prior to the notice of termination. According to HSJV, at the time of termination it had completed 58.12% of the work to be performed under Contract B, and 49.05% under Contract E. If that is so, and if the project had been progressing without a hitch, then what the City owes on the original contract work would be a simple mathematical calculation and would include the expected profit if the bids accurately tracked actual costs.

---

[1] As a matter of convenience, we will hereafter treat Harston Schwendener, a Joint Venture (HSJV), as the plaintiff.

Before we get back to how that amount should be or can be determined, let us consider the rest of it – all the amounts HSJV claims it spent to overcome the various delays and changes. The city rejects any amounts for costs resulting from changes, unless there was a written change order citing section 103.3, and for costs resulting from delays, even if caused by the City, citing section 104.4. But that position, for several reasons, overstates the strength of the City's position.

HSJV'S entitlement depends on Illinois law, and the contracts are central to a determination of the City's obligations. Federal law and regulations do not control, although the concepts in federal cases dealing with those laws and regulations are often relied upon by the Illinois courts. A persistent theme runs through those cases: a contractor should be fairly paid for the work he has satisfactorily completed when the work was authorized by the owner. If he has increased costs through no fault of his own he should be compensated for those costs, if they are reasonable. But the owner should have no obligation to reimburse a contractor for increased costs on work beyond the scope of the original contract, when they are due to the contractor's inefficiency or extravagance. In short, there has to be a determination of what costs are attributable to the owner and what costs are attributable to the contractor. Initially, the City substantially subscribed to that view when it advised HSJV as to how it intended to process its claims.

Exculpatory clauses are viewed restrictively by the courts when they would result in harsh results contrary to that theme. "No damages for delay" clauses are enforceable – but not if the delays were not within the contemplation of the parties or were of unreasonable duration or attributable to the owner's representative's inexcusable ignorance or incompetence. Mellon Stuart Constr. Co. v. Metro. Water Reclamation Dist. of Greater Chicago, 1995 WL 239371,

*10 (N.D. Ill.). *And see* §104.8.  Further, what are delay costs?  It is one thing to keep employees on the job when the work has been delayed; it is quite another when delays caused by changes in plans require work to be done out of sequence or in an awkward fashion. Contractual clauses requiring written change orders can be waived by conduct. <u>Atlee Elec. Co., Inc. v. Johnson Constr. Co.</u>, 14 Ill.App. 3d 716, 303 N.E.2d 192, 197 (Ill.App. 1st Dist. 1973). And the City cannot deny that it was well aware of the countless revisions of plans that disrupted and increased the work. *See* <u>E.R. Stone v. City of Arcola</u>, 181 Ill.App. 3d 513, 536 N.E.2d 1329, 130 Ill.Dec. 118, (Ill.App. 4th Dist. 1989).

It is fair to say that the City expected additional claims; it has paid out many millions for such claims by other contractors.  How the City has viewed its obligations to other contractors, presumably with similar or identical core contract provisions, is relevant to how the City, at least, viewed its obligations. *See* <u>Pitt-DesMoines, Inc. v. Metro. Pier & Exposition Auth.</u>, 1999 WL 14491 (N.D. Ill.).  Given the unusual course of this project, we are not persuaded by the City's present hard line position.

But, that said, it does not resolve the issue of what methodology should be used to determine what, if anything, is due.  Even the completed percentage of the original contracts is clouded by the likelihood that the work contemplated by those contracts was so altered by changes that it may be difficult to measure how much of that contemplated work was actually done.  The City insists that HSJV detail what additional work was necessitated by what changes.  HSJV counters by arguing that is impossible – the revisions in plans and schedule were so many and so ongoing that it cannot attribute specific costs to specific events.  And, on the basis of what we know about the project, that appears highly probable.

So where does that leave us?  Despite some expressed concerns abut the scope of

discovery, it appears that the City has had access to HSJV's books and records so as to know what HSJV spent and for what and when. It knows how it has resolved claims from other contractors, and how much it has paid, and therefore has a general notion of the inflation of original amounts up to the time of termination here, although, obviously, there were differences in the problems faced by the various contractors. It knows the plan revisions and the schedule changes. It can then make judgments about what the work done by HSJV should have cost, although those judgments will not be based upon mathematical certainties.

We believe that this determination must proceed by the modified total cost methodology. The total cost methodology has often been described as not favored. *See* Amp-Rite Elec. Co. v. Wheaton Sanitary Dist.,220 Ill.App.3d 130, 580 N.E.2d 622, 640, 162 Ill.Dec. 659 (Ill.App. 2nd Dist. 1991); Fattore Co. v. Metro. Sewerage Comm'n of the County of Milwaukee, 505 F.2d 1, 5-6 (7th Cir. 1974); Propellex Corp. v. Brownlee, 342 F.3d 1335 (Fed.Cir. 2003); Raytheon Co. v. White, 305 F.3d 1354,1365-66 (Fed.Cir. 2002); Servidone Constr. Corp. v. United States, 931 F.2d 860, 861-62 (Fed.Cir. 1991); J. D. Hedin Constr. Co. v. United States, 347 F.2d 235, 171 Ct. Cl. 70 (1965). But, as those cases explain, it is necessary to use that methodology when the contractor is entitled to an adjustment but cannot prove the increased costs to which it is entitled to a mathematical certainty. It assumes that the bid was accurately computed, that the costs were reasonable, and that the contractor was not responsible for the increases. But that is only the starting point, and the contractor, in a modified total cost methodology, must vigorously exclude any costs it cannot justify and must prove the reasonableness of the assumptions to convince the trier of fact that the amount claimed fairly represents the increased costs the contractor directly suffered from the defendant's actions. Propellex Corp., 342 F.3d at 1339.

It is not enough for HSJV to say, "These are our total costs. Pay them, together with a reasonable profit." Some proof of reasonableness is required. But it is not enough for the City to say, "Tie each cost to a specific revision of plans or schedule, or we will not pay." It, too, must make its own analysis of what increased costs are reasonably attributable to its own conduct. There is nothing to suggest that HSJV has made a rigorous analysis. And the City has not indicated that it has made any analysis of the reasonableness of the costs. If this long drawn out dispute is ever going to be concluded, each party should do so, and exchange that information. It is in that context that this court much earlier encouraged mediation. We encourage it again.

We grant the motion to clarify, and this is the clarification.

_____
JAMES B. MORAN
Senior Judge, U.S. District Court

March 8, 2005.